[781 NYS2d 515]

Marco Srour, Respondent, v Dwelling Quest Corp., Appellant.

First Department, September 9, 2004

## APPEARANCES OF COUNSEL

*Frederic Walker*, New York City, for appellant.

*Law Offices of Steven M. Nachman*, New York City (*Steven M. Nachman* of counsel), for respondent.

## OPINION OF THE COURT

SAXE, J.

This appeal concerns the point at which a real estate broker earns its commission, and whether a commission properly earned can be subsequently negated due to an intervening change in the premises' condition. It also requires us to acknowledge an apparent unfairness, and consider who should be held answerable for it.

Plaintiff requested the defendant real estate broker to locate a suitable Manhattan apartment for himself and his family, and ultimately executed a lease for a penthouse apartment shown to him by defendant's agent, located at 360 East 65th Street, at a rent of $11,000 per month. While plaintiff demanded that repairs be made to a damaged wood floor in the living room and a water damage patch on the ceiling in the bedroom before he would take occupancy, there is no serious dispute that the apartment was habitable and suitable for occupancy at the time he signed the lease on July 20, 2000. The lease provided that plaintiff would take occupancy of the apartment on August 15, 2000, which allowed the landlord time to make agreed-upon repairs within the unit. No mention was made of any necessary roof repair work for the building, and there was no scaffolding in place and no work being performed.

The parties' brokerage agreement provided for a 15% commission for a one year rental, payable at the time of the lease signing. Pursuant to these terms, the commission would have totaled $19,800. On July 24, 2000, plaintiff offered defendant $13,000 in cash in full payment of the commission, which defendant accepted.

When plaintiff reexamined the penthouse apartment during the first week of August, his inspection disclosed conditions very different from those which he observed when he agreed to lease the unit. The windows were covered; scaffolding was in

place; the ceiling in the master bedroom had caved in from a water leak; the whole roof was being ripped up to prevent leakage and the unit's wraparound terrace was completely inaccessible. Renovation work was expected to take six to eight months, which included constant drilling. Plaintiff demanded that the landlord cancel the lease and return his first month's rent and security deposit. The landlord complied.

However, defendant broker refused plaintiff's demand for a refund of the commission previously paid, and this lawsuit followed. The Civil Court held for the tenant and against the broker, and Appellate Term affirmed, reasoning that the entire transaction must be viewed as a nullity, and that defendant should not be deemed to have earned its commission inasmuch as the lease was "immediately rescinded." (2003 NY Slip Op 50633[U], *3.)

We disagree. The application of well-settled common law informs us that the broker's job was fully performed, and its commissions irrevocably earned, upon the signing of the lease. The subsequent developments that prevented the landlord from performing its obligations under the lease to provide plaintiff with the apartment, in the agreed-upon form, were irrelevant to the brokerage agreement (*see Kaplon-Belo Assoc. v Farrelly*, 221 AD2d 321 [1995]).

The applicable common-law rule is that "a broker who 'produces a person ready and willing to enter into a contract upon his employer's terms . . . has earned his commissions' " (*Feinberg Bros. Agency v Berted Realty Co.*, 70 NY2d 828, 830 [1987], quoting *Tanenbaum v Boehm*, 202 NY 293, 299 [1911]). In fact, under the common law a broker is entitled to be paid commissions *even if no contract is ever signed,* as long as a person ready and willing to enter into the proposed contract is produced (*see e.g. Tanenbaum v Boehm*, 202 NY 293 [1911]; *Mooney v Elder*, 56 NY 238 [1874]).

Here, the broker's task as defined in the parties' contract was "assisting in the location and renting of a suitable apartment." The apartment in question constituted a "suitable apartment" at the time it was located and rented, and the signing of the lease was specified as the critical moment at which the broker's commission was earned.

The broker's obligation toward plaintiff was entirely distinct from the landlord's obligation toward plaintiff. The broker's obligation was to locate a suitable apartment for plaintiff to lease; this, it did. The landlord's obligation was to provide

plaintiff with the habitable apartment in the form he had observed it and leased it, complete with wraparound terrace, and intact ceilings. This obligation was breached by the landlord.

If there had been any indication that the broker had any part in a fraud or misrepresentation in obtaining plaintiff's agreement to lease the apartment in question, or that it was aware of any latent or concealed defects that would later render the premises unsuitable for occupancy, it would be appropriate to conclude that the broker did not actually perform its contractual obligations properly, and therefore was not entitled to its commissions; but there is no such showing here.

The subsequent cancellation of the lease has no effect on a fully performed brokerage agreement. The rule of *Kaplon-Belo Assoc. v Farrelly* (221 AD2d 321 [1995]) is applicable here. There, after the lease was signed, the tenant defaulted, and the landlord argued that the broker was not entitled to its commission because it had not produced a tenant who was financially able to meet the terms of the lease. The Second Department held that once the parties entered into the lease, the tenant's default can have no effect on the broker's right to its commission (*id.*). The same is true here: once the lease was signed, the broker's right to its commission was unaffected by the landlord's subsequent default in its obligation to the tenant to maintain the premises in a habitable condition, and in the condition in which it appeared at the time of the lease.

Of course, the " 'parties to a brokerage agreement are free to add whatever conditions they may wish to their agreement' " (*Feinberg Bros., supra* at 830 [citation omitted]). For instance, in *Graff v Billet* (64 NY2d 899 [1985], *affg* 101 AD2d 355 [1984]), the parties specifically included in their agreement that the commission would be due and payable "as, if and when title passe[d], except for willful default on the part of the seller" (101 AD2d at 355). Therefore, in *Graff* the broker did not earn the commission merely by presenting a willing purchaser, or even upon the signing of a contract; it was earned only at the time of the contract's closing, when title passed (*id.*).

Here, however, unlike *Graff*, the parties did not insert in the agreement any "precondition" requiring that the tenant be in occupancy in the residence before the broker's obligation is discharged and the commission earned. There was no provision or condition that the broker's obligation to the client would continue until the client took occupancy. The only "condition"

supplied by the written brokerage agreement was the provision specifying that once a suitable apartment had been located and rented, the commission would be *payable upon the signing of a lease*. Nothing was included in, or added to, this brokerage agreement, which could be interpreted as extending the broker's general obligation to the plaintiff past the date when the lease was signed.

Therefore, based upon the terms of the brokerage agreement and the application of the common law, the broker's commission was earned, and the broker's job was completed, at the moment the lease was signed.

Ignoring the terms of the brokerage agreement, the Civil Court simply reasoned that the broker had not earned its commission since plaintiff was not provided with a livable apartment to move into. Appellate Term also failed to enforce the language of the brokerage agreement, remarking that a " 'suitable' apartment" was not provided, characterizing the lease as having been "immediately" rescinded and terming the entire transaction a nullity. (2003 NY Slip Op 50633[U], *3.) The dissent now provides its own legal reasoning in support of these rulings, by interpreting the lease, *with the assistance of trial testimony*, as requiring that the apartment be suitable not just at the time of entering into the lease, but also at the time of occupancy. In order to do this, it finds the brokerage agreement to be ambiguous so that it may use parol evidence to graft onto the brokerage agreement a proviso not actually contained in the agreement, namely, that the apartment must have been suitable for occupancy not only when the apartment was located and rented, but additionally, up to the first day the tenant takes occupancy.

The flaw with this reasoning, however, is that parol evidence may only be used to interpret an agreement when the agreement is ambiguous (*see R/S Assoc. v New York Job Dev. Auth.*, 98 NY2d 29 [2002]). Here, review of the simple, one-page brokerage agreement discloses no ambiguity. The four corners of the document establish that plaintiff engaged defendant "to act as broker on their behalf for the purpose of assisting in the location and renting of a suitable apartment." These words do not require parol evidence to be understood: the broker's job was to assist plaintiff in finding and leasing an apartment. Similarly, there is no doubt that the apartment in question constituted a "suitable apartment" at the critical time, the time it was located and rented.

Moreover, since the language of the brokerage agreement needs no parol evidence in order to determine its intent, the testimony of defendant's sales agent, expressing her belief that the commission was not earned unless the client actually took up residence in the apartment, is irrelevant. Regardless of this individual's understanding of the agreement, its written terms are clear, and to the contrary: the commission was earned upon the signing of the lease. Moreover, even if parol evidence were necessary to determine the intent of the agreement, her opinion as to this point would have been irrelevant, since she had no part in drafting it.

The rulings issued by the Civil Court and Appellate Term are, I believe, founded upon a well-intentioned notion that fairness requires the broker to refund the money. Indeed, the perception of unfairness here is understandable. After all, the deal never came to pass; therefore, from a practical point of view, it makes sense that everyone should be returned to their previous positions. Moreover, the sense of unfairness is strengthened by the straits that plaintiff and his family (including three young children) found themselves in, finding out only one week before their intended move that they had no place to live, and having to stay at a hotel until they found another apartment.

But, when established law exists that squarely covers the situation, it should not be ignored in the interests of responding to a perceived unfairness in a unique situation. It is of critical importance to our legal system that established rules be applied consistently; we must not change rules from case to case in order to reach a result we feel is fairest in each situation. The common law develops in response to changes in society (*see generally* Holmes, The Common Law, at 1-2 [Dover ed]; Cardozo, Nature of the Judicial Process, at 24-28 [Yale Univ Press]). Equitable doctrines develop over time to create exceptions when application of a general rule of the common law is found to be harsh or unfair. However, such exceptions should come into being not based upon a single unique circumstance which appears to have led to a harsh result, but based upon a body of experience demonstrating a clear need for such an exception.

The ruling of the Civil Court and Appellate Term, and the view expressed by the dissent here, essentially amounts to a fundamental change in the law related to real estate brokers. However well-intentioned, such a change would ultimately be misguided, protecting one individual at the expense of the stability of the law. Business people, lawyers or brokers must be able

to rely upon the certainty of established common law regarding the point at which a broker's commission is irrevocably earned.

The error in the dissent's reading of the brokerage agreement is illustrated by considering that the same reasoning could as well be adopted even where the apartment became uninhabitable *after* the tenant took occupancy. The court would simply have to interpret the brokerage agreement to contain a condition that the apartment must *remain* suitable for occupancy subsequent to the tenant's taking possession. Indeed, once the court read such a condition into the agreement, it would be a short step to formulating a remedy against the broker, perhaps requiring it to disgorge a proportionate share of its commission. Contemplation of this scenario, only slightly more extreme than the situation before us, demonstrates why the insertion of an implicit condition in the brokerage agreement should be rejected.

The Court of Appeals has repeatedly instructed that "courts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing" (*Vermont Teddy Bear Co. v 538 Madison Realty Co.*, 1 NY3d 470, 475 [2004], quoting *Reiss v Financial Performance Corp.*, 97 NY2d 195, 199 [2001]). The parties' brokerage agreement having clearly provided that the commission was payable upon the signing of the lease, this Court may not ignore that provision, by grafting onto the agreement a provision that the commission is not actually earned until the tenant takes occupancy. If such a provision is intended, or needed, it must be placed in the contract.

There being nothing ambiguous in the clear, one-page brokerage agreement, we ought to enforce it as written, and deny plaintiff the reimbursement he claims. I would suggest that the correct remedy for the out-of-pocket expense of commissions he paid is not to ask the broker to disgorge its fee, but to hold the landlord liable for all the resultant costs as consequential damages arising out of its breach of the lease.

Accordingly, the order of the Appellate Term of the Supreme Court, First Department, entered March 19, 2003, affirming a judgment of the Civil Court, New York County (Stuart Cohen, J.H.O.), entered August 20, 2001, which, after a nonjury trial, directed the return of a brokerage commission in the principal amount of $13,000, should be reversed, on the law, without costs, the judgment vacated and the complaint dismissed. The Clerk is directed to enter judgment accordingly.

MAZZARELLI, J. (dissenting). This is an action for breach of a real estate brokerage contract. Plaintiff retained defendant to help him rent an apartment for himself and his family, pursuant to an agreement which provided:

> "The undersigned hereby engages Dwelling Quest to act as broker on their behalf for the purpose of assisting in *the location and renting of a suitable apartment*. In consideration of Dwelling Quest having directed the undersigned to any of the addresses listed below, should the undersigned or anyone acting on their behalf rent, sublet, or in any way obtain an apartment in any of the buildings, the undersigned agrees to pay Dwelling Quest, at the time of lease signing, a commission . . ." (emphasis supplied).

Defendant's agent, Cindy Gise, found an apartment which seemed to meet plaintiff's needs. However, in August 2000, prior to the commencement of the executed lease, plaintiff happened to visit the apartment and found that due to an extensive renovation project at the building, the apartment did not meet even a minimal standard of habitability, and that it would remain in this condition for six to eight months. Although the trial testimony reveals that Dwelling Quest made some further attempts to find another apartment for plaintiff, these efforts were ultimately abandoned.

At common law "a broker who 'produces a person ready and willing to enter a contract upon his employer's terms . . . has earned his commissions' " (*Feinberg Bros. Agency, Inc. v Berted Realty Co.,* 70 NY2d 828, 830 [1987], quoting *Tanenbaum v Boehm,* 202 NY 293, 299 [1911]). However, there is a corollary right of the parties to " 'add whatever conditions they may wish to their agreement' " (*Feinberg, supra* at 830 [citation omitted]; *see also Graff v Billet,* 64 NY2d 899 [1985] [agreement for sale of property explicitly stating that commission was due and payable at the time of passing of title to property]).

The language of the instant brokerage agreement, which required defendant to "assist[ ] in the location and renting of a suitable apartment" is ambiguous as to the parameters of defendant's duties. The contract is also unclear as to whether the requirement that the commission be paid at the signing of the lease limits the broker's substantive obligations as of the signing of a lease, or whether this provision was merely included to indicate the point at which payment was due. Because *it is*

settled that any ambiguities in a contract must be construed against the drafter (*Jacobson v Sassower*, 66 NY2d 991, 993 [1985]), I interpret it to provide that in consideration for the payment of a commission, defendant agreed to procure an apartment for its client suitable for rental, and I find that defendant's substantive obligations were not discharged at the time of the signing of this lease. Further, because plaintiff could not move into this apartment, due to its state of disrepair, I would conclude that defendant did not meet its obligation to find plaintiff a suitable apartment, and it was not entitled to retain the $13,000 brokerage commission.

The trial testimony of Cindy Gise, the agent who signed the contract on Dwelling Quest's behalf, is revealing. When asked about her understanding of when defendant's right to the commission vested, she testified that as a broker, she did not earn her commission unless the brokerage service resulted in the client actually taking up residence in the apartment.

The majority finds the instant agreement to be simple, clear and uncomplicated. Curiously, the majority's interpretation of the contract is in direct conflict with the interpretation of both plaintiff and the Dwelling Quest agent assigned to the deal. The majority also mischaracterizes my position as proposing "a fundamental change in the law related to real estate brokers," specifically criticizing what it views as a "well-intentioned" but "misguided" "insertion of an implicit condition in the brokerage agreement." I disagree, given that any conclusions as to the rights and duties of the parties to this specific contract are governed by the settled principles of contract law. Faced with an ambiguous agreement, I have construed the uncertainty as to whether a "suitable" apartment was a condition precedent to the broker's entitlement to a commission against the drafter, defendant Dwelling Quest (*see Jacobson, supra*).

Supporting our interpretation, Gise's testimony demonstrates that the precondition of placing the tenant in the residence was consistent with the expectations of the parties. Because there was no minimally habitable apartment available for plaintiff and his family as of the date of commencement of this lease, I would find that Dwelling Quest was not entitled to a broker's commission for this rental.

The majority also contends that the Second Department's holding in *Kaplon-Belo Assoc. v Farrelly* (221 AD2d 321 [1995]) requires a reversal here. In that case, the tenant defaulted after a lease was signed, and the Court held that the landlord's bro-

ker was still entitled to its full commission based upon the well-settled rule that

> " 'absent an agreement to the contrary, a real estate broker earns his commission when he produces a party who is ready, willing and able to purchase or lease on the terms set by the seller lessor' (*Holzer v Robbins*, 141 AD2d 505, 506)." (*Kaplon-Belo*, 221 AD2d at 321.)

The distinction between this case and *Kaplon-Belo* is that the agreement in this case contained language specifying that defendant would find plaintiff a "suitable" apartment. In addition, as discussed, defendant's agent confirmed that the broker was required to place a tenant in an apartment before it earned its commission. The ambiguity in the instant contract takes this case out of the realm of the common-law rules generally applicable to a brokerage agreement, and as interpreted, I find that the instant agreement obliged defendant to place its client in a suitable apartment. Having failed to perform its obligations under this contract, defendant was not entitled to a commission.

Finally, there is no disagreement that a balancing of the equities favors plaintiff's position. Plaintiff and his family anticipated moving into their apartment on August 15, 2000. After signing the lease, but before the move-in date, plaintiff happened to visit the apartment, to discover a degree of disrepair which the landlord agreed was grounds for canceling the lease. Nonetheless, plaintiff, his wife and his three young children were left without a place to live, a week before their intended move. They were forced to stay at a hotel until they found another apartment.

Accordingly, I would agree with the Civil Court and the Appellate Term that because defendant did not meet its obligation of procuring a "suitable" apartment for plaintiff "[t]he entire transaction can only be reasonably viewed as a nullity, as it was by the immediate parties to the lease" (*Srour v Dwelling Quest Corp.*, 2003 NY Slip Op 50633[U], *3 [App Term, 1st Dept 2003]). Accordingly, I would affirm the order appealed and direct the return of a brokerage commission in the principal amount of $13,000.

NARDELLI, J.P., and TOM, J., concur with SAXE, J.; MAZZARELLI and LERNER, JJ., dissent in a separate opinion by MAZZARELLI, J.

Order of the Appellate Term of the Supreme Court, First Department, entered March 19, 2003, affirming a judgment of

the Civil Court, New York County, entered August 20, 2001, reversed, on the law, without costs, the judgment vacated and the complaint dismissed. The Clerk is directed to enter judgment accordingly.